**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**FOURTH DIVISION**

| | | |
|---|---|---|
| Kimberly Kay Witczak, Surviving Spouse and Trustee for Next of Kin of Timothy Michael Witczak,<br><br>Plaintiff,<br><br>vs.<br><br>Pfizer Inc<br><br>Defendant. | ) | File No. 04-CV-2819-JMR-FLN |

**EXHIBITS IN SUPPORT OF DEFENDANT PFIZER INC'S MOTION AND MEMORADUM OF LAW IN SUPPORT OF DEFENDANT PFIZER INC'S MOTION FOR SUMMARY JUDGMENT (PREEMPTION) VOLUME 1 OF 25 (Exs. A-B)**

Joseph M. Price, #88201
Peter J. Goss, #267910
Faegre & Benson LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
(612) 766-7000

Amy L. Padden, *admitted pro hac vice*
Wheeler Trigg Kennedy LLP
1801 California Street, Suite 3600
Denver, CO 80202
(303) 292-2525 (Telephone)
(303) 294-1879 (Facsimile)

Attorneys for Defendant Pfizer Inc

EX. A APPENDIX OF EXHIBITS IN SUPPORT OF DEFENDANT PFIZER INC'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT PFIZER INC'S MOTION FOR SUMMARY JUDGMENT (PREEMPTION)

FILED PSL
04 MAY 20 PM 12: 24
BY ___ DEPUTY
COURT ADMINISTRATOR

| | |
|---|---|
| STATE OF MINNESOTA | DISTRICT COURT |
| COUNTY OF HENNEPIN | FOURTH JUDICIAL DISTRICT |
| | Case Type: Wrongful Death |
| Kimberley Kay Witczak, Surviving Spouse and Trustee for Next of Kin of Timothy Michael Witczak, | Court File No. WD 04-6680 |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| Pfizer, Inc., a New York corporation, | **Jury Trial Demanded** |
| Defendant. | |

The plaintiff, as and for her Complaint against the above-named defendant, alleges as follows:

**Nature of Action**

1. This is an action for wrongful death under Section 573.02 of the Minnesota Statutes. On or about August 6, 2003, Timothy Michael Witczak died as a result of severe side effects from the drug Zoloft which is manufactured, promoted, marketed, and distributed by the defendant Pfizer, Inc. and which was dispensed to him first in sample form and later by prescription by his family doctor.

**The Parties**

2. The plaintiff, Kimberley Kay Witczak, is (a) an adult resident of Minneapolis, Minnesota, (b) the surviving spouse of Timothy Michael Witczak, alternatively referred to herein as "the decedent," and (c) the Court-appointed Trustee for the decedent's next of kin as more fully described below.

3. Defendant, Pfizer, Inc. (hereinafter referred to as "Pfizer") was and still is a corporation duly existing under and by virtue of the laws of the State of New York. It is engaged in the business of

research, development, testing, manufacturing, promoting, distributing, marketing, and selling pharmaceutical drugs, including the drug Zoloft (generically known as sertraline), which are distributed throughout Minnesota, including Hennepin County. Pfizer is authorized to do business and in fact is doing business in the State of Minnesota and Hennepin County.

4. Pfizer has appointed the following as its agent for service of process in the State of Minnesota:

CT Corporation System, Inc.
405 Second Avenue South
Minneapolis, Minnesota 55402

CT Corporation System, Inc. was Pfizer's duly-authorized agent for service of process on the date the Summons and Complaint were served upon CT Corporation System, Inc. in this matter.

**Trustee Appointment under Minn. Stat. §573.02 and Order Admitting Lead Counsel *Pro Hac Vice***

5. In an Order dated May 12, 2004, issued by the Honorable H. Peter Albtrecht, Judge of Hennepin County District Court, in Hennepin County District Court, File No. 04-6680, Kimberley Kay Witczak was duly appointed Trustee for the Next of Kin of the decedent Timothy Michael Witczak pursuant to and in compliance with Section 573.02 of the Minnesota Statutes and Rule 144 of the Minnesota General Rules of Practice. A true and correct copy of said Order is attached hereto as **Exhibit A.** Said appointment is valid, and said Trustee may maintain this action on behalf of the next of kin of Timothy Michael Witczak. On that same date, an Order was issued by Judge Albrecht admitting the undersigned lead counsel *pro hac vice* for purposes of this proceeding, and a true and correct copy of that Order is attached hereto as **Exhibit B.**

**Compliance with Minn. Stat. §604.04**

6. On April 21, 2004, in compliance with Minn. Stat. §604.04, the plaintiff provided a Notice of Claim to Pfizer. A true and correct copy of said Notice of Claim is attached hereto and incorporated by reference herein as **Exhibit C.**

**The Drug Zoloft**

7. Zoloft is, and at all relevant times has been manufactured, produced, marketed, sold, distributed, merchandised, packaged, promoted, and advertised by Pfizer as an allegedly safe and effective drug for the treatment of depression and other medical conditions.

8. Zoloft is a member of a class of drugs known as "selective serotonin reuptake inhibitors," or "SSRI's" which include other similar drugs such as Paxil (which has nearly identical methods of action and side-effect profile). Pfizer secured FDA approval to market Zoloft as an antidepressant in late 1991.

9. Zoloft can cause side effects such as emotional blunting, depersonalization and a condition called "akathisia," which alone or in combination with other side effects, such as emotional blunting, are associated with acts of self-harm. Akathisia is a neurological phenomenon with characteristics of intense internal restlessness, agitation and dysphoria. In addition, Zoloft can cause some patients to become manic, hypomanic, or even psychotic, with such conditions leading to their death. Zoloft "pushes" the serotonin system, which can result in reciprocal switching off of the dopamine system. In the striatum of the brain, this can result in tremor and occasional dystonia and in the frontal lobes it can result in symptoms similar to the negative symptoms of schizophrenia. These symptoms can include patients feeling as if they were

outside of their body. In short, the drug, which may be no more effective than placebo[1], can drive some people to their death.

10. Pfizer touts Zoloft as a cure for a chemical imbalance in the brain which is nothing short of speculation. As one renowned psychiatrist put it: "[SSRIs] are not correcting a biochemical imbalance, these drugs create severe imbalances in the brain. ... The idea that human suffering, psychological suffering, is biochemical is strictly a promotional campaign, perhaps the most successful in the history of the world, created by the drug companies. We do not even have a technology, a scientific technology, for measuring what happens inside the brain ... it is literally a fabrication." In fact, the Irish equivalent to the FDA (the Irish Medicines Board or "IMB"), recently forced the maker of the SSRI Paxil to withdraw claims that the drug works by normalizing serotonin levels in the brain because these claims "were not consistent with the scientific literature."

[1] A recently published study, which analyzed the clinical trial data submitted to the FDA to establish the efficacy of six of the most widely prescribed antidepressants (including Prozac, Paxil, and Zoloft), found the efficacy of these drugs to be "clinically negligible." The Emperor's New Drugs: An Analysis of Antidepressant Medication Data Submitted to the U.S. Food and Drug Administration by Irving Kirsch (University of Connecticut), Thomas J. Moore (The George Washington University School of Public Health and Health Services) and Alan Scoboria and Sarah S. Nicholls (University of Connecticut). That is not to say the drugs have no effect, but that they lack effectiveness in treating the conditions for which they are prescribed (e.g., depression). Internal company documents demonstrate that Pfizer was *well aware* that this was the case, however, touted the drug as highly effective, despite its risks. This has left doctors incapable of conducting a proper risk/benefit analysis. Furthermore, internal FDA documents also point out "'the lack of robustness' of the clinical evidence supporting Zoloft's efficacy ..." and stressed that the FDA itself might come "under attack by constituencies that do not believe [the FDA] is an demanding as it ought to be in regard to its standards for establishing the efficacy of antidepressant drug products."

11. Pfizer has known for years that Zoloft can induce akathisia, yet has failed to warn either prescribing physicians or the consuming public about this dangerous condition.[2] In fact, Dr. Roger Lane, former Medical Director of the Zoloft Product Strategy Team at Pfizer, wrote two published, peer-reviewed scientific articles concerning akathisia and the risk of suicide for all SSRI drugs, including Zoloft. These articles are entitled ***"SSRI-Induced extrapyramidal side-effects and akathisia: implications for treatment,"*** Journal of Psychopharmacology, 12(2)(1998), pp. 192-214; and ***"Selective Serotonin Reuptake Inhibitor-Induced Serotonin Syndrome: Review,"*** Journal of Clinical Psychopharmacology, 17(3)(1997), pp. 208-22. As Dr. Lane writes, these conditions are sometimes hard to detect and

---

[2] Dr. Cathryn Clary, testifying on behalf of Pfizer, admitted that Zoloft can cause akathisia during a Rule 30(b)(6) deposition in *Motus v. Pfizer, Inc.*, 127 F.Supp.2d 1085 (C.D.Cal. 2000). Dr. Clary testified as follows:

> Q Is akathisia also known as hyperkinesia?
> A Yes.
> Q And both akathisia and hyperkinesia are considered extrapyramidal symptoms or disorders?
> A Yes. Akathisia is considered an extrapyramidal symptom or disorder, as is hyperkinesia. But, again, there could be other causations. These terms are also similar to agitation, psycho motor agitation. It often could be very difficult to tell the difference between.
> Q Do you agree that Zoloft can cause some people to experience akathisia or hyperkinesia?
> A Yes.
> Q How long has that been established, to your knowledge?
> A I'm sure there were reports of the initial clinical trials of the depression database, depression studies that were occurring back in the 1980's.

Moreover, one of Pfizer's own expert witnesses testified in a jury trial related to the SSRI Paxil, that "akathisia has the potential when it is severe of contributing to suicidality and aggression." Another expert witness for Eli Lilly, the manufacturer of Prozac, similarly testified: "SSRI drugs can cause akathisia ... I believe that what akathisia does is it creates a state of severe anxiety which can exacerbate pre-existing proclivities, tendencies, in an individual to engage in either suicide or violence."

diagnose, although not so hard to treat. *E.g.* "SSRI-induced akathisia is a relatively rare event but is frequently unrecognized when it does occur." For this reason, it is imperative that both physicians and their patients be forewarned and alerted.

12. Pfizer has warned neither the medical community nor patients of the risks documented by Dr. Lane's publications and other scientific literature. In fact, Pfizer sent a company-wide memorandum instructing the Pfizer sales force not to distribute Dr. Lane's article to prescribing physicians. Additionally, its U.S. package insert and marketing materials do **not** warn about the risk of "SSRI-induced" akathisia, do **not** warn of the attendant risk of suicidality, do **not** warn about emotional blunting and depersonalization, do **not** warn about the risk of mania and psychosis and do **not** warn that this drug is associated with conditions that can directly lead to death.

13. On March 22, 2004, the FDA requested that all SSRI manufacturers warn of the above conditions and, while most manufacturers have complied with this request (for example, see excerpts of the FDA-approved warning for Paxil, attached as **Exhibit D**), Pfizer has yet to do so.

14. Pfizer has aggressively distributed and marketed Zoloft, encouraging all types of physicians (including those who have no specialized training or expertise in the mental health field such as decedent's family doctor) to dispense and prescribe Zoloft, not only for depression, but also for other maladies. As a recent publication, touting Pfizer, illustrates, this is consistent with Pfizer's corporate philosophy: "Research... is only half of what fuels Pfizer. The other half is marketing... At Pfizer marketing infuses every aspect of drug development and delivery. ... The **marketing equation** is simple: If patients primed by TV commercials ask doctors, swayed by sales visits, about drugs with compelling clinical trial results, lots of prescriptions will get written." Woolley, ***Science & Savvy***, FORBES, Vol. 163, No. 1, p. 122, 123

(January 11, 1999)

15. Pfizer advertises Zoloft, both in professional medical publications and, more recently, in "direct to consumer" advertising. Pfizer has so aggressively marketed Zoloft, that its over-promotion has nullified what warnings Pfizer has given regarding this drug. Thus, Pfizer's legal liability is predicated, not only upon those things which it failed to tell prescribing physicians and patients, but also on its affirmative misrepresentations. Plaintiff alleges that Pfizer, acting primarily through its bonus-incentive sales force, went to great lengths to assure doctors that the side effects that can lead to death would not occur with Zoloft, and to assuage patients' concerns over the initial adverse effects which are frequently the harbingers of tragedy.

## CLAIMS FOR RELIEF

## COUNT ONE - NEGLIGENCE

As and for her first claim for relief against Pfizer, the plaintiff re-alleges all foregoing allegations as if fully set forth hereunder, and further alleges as follows:

16. On or about June 30, 2003, Timothy Michael Witczak first began taking Zoloft. The drug was prescribed by his family physician. Decedent ingested/consumed Zoloft for the next five weeks until his death. During this period of time, Timothy Michael Witczak experienced and endured grievous pain and suffering from the side effects of Zoloft, including but not limited to, akathisia, agitation, anxiety, an inability to concentrate, confusion, depersonalization, emotional blunting and thoughts of self-harm. On August 6, 2003, due to the severity of the side effects of Zoloft, decedent hung himself.

17. The death of decedent was the result of the negligence and misrepresentations of Pfizer, through its agents, servants and/or employees acting within the course and scope of their employment,

including, among other things:

(a) Carelessly and negligently researching, manufacturing, selling, merchandising, advertising, promoting, labeling, analyzing, testing, distributing, and marketing Zoloft;

(b) Failing to properly and adequately test Zoloft for its intended uses;

(c) Failing to fully disclose the results of the testing and other information in its possession regarding the possible adverse reactions of Zoloft;

(d) Being careless and negligent in that Pfizer knew or should have known that Zoloft was a substance known to produce life threatening side effects upon certain users, including but not limited to emotional blunting, mania, psychosis, emotional lability and akathisia, that can result in death;

(e) Negligently and carelessly failing to adequately warn the medical community, the general public and decedent's physician and Timothy Michael Witczak, in particular, of the dangers, contra-indications and side effects from the use of Zoloft;

(f) Negligently and carelessly representing that Zoloft was safe and effective for use for all purposes intended when, in fact, it was unsafe and ineffective for a significant percentage of users;

(g) Negligently and carelessly failing to conduct sufficient testing programs to determine whether or not Zoloft was safe for use as stated and advertised by defendant;

(h) Negligently and carelessly failing to act as a reasonably prudent drug manufacturer;

(i) Negligently and carelessly failing to conduct randomized clinical trials or other scientifically valid tests to determine whether and to what extent Zoloft causes some people to experience side effects that can result in their death;

(j) Negligently and carelessly failing to perform appropriate psychological post-mortems on those people who have died as the result of severe side effects of Zoloft to investigate the potential role of Zoloft in those deaths; and

(k) Negligently and carelessly over-promoting Zoloft in a zealous and unreasonable way, without regard to the potential danger that it poses for patients.

18. Prior to the date upon which the drug, Zoloft, was first taken by decedent, Pfizer, based upon the state of knowledge as it existed at the time, knew or should have known that Zoloft could be dangerous and unsafe for use by members of the general public and knew or should have known that it was a substance which could cause intense agitation and other chemically-induced conditions that could lead to self-harm and death. Accordingly, Pfizer breached it duty of reasonable care and failed to avoid any unreasonable risk of harm to anyone, including the decedent, who was likely to be exposed to harm when the product was put to its intended use.

19. As a direct and proximate result of the aforesaid conduct of Pfizer, Timothy Michael Witczak took Zoloft which caused his death and the Plaintiff has been damaged as follows:

**Damages and Liability.**

20. The decedent is survived by his wife, Kimberley Kay Witczak; his parents Chester Walker Witczak and Mary Ann Witczak; his brothers Christopher J. Witczak and Chester J. Witczak; and his grandmother Loretta Witczak.

21. At the time of his death, the decedent was employed full-time by XE Energy as Vice President of Sales. Had he survived, he would have earned a substantial salary along with fringe benefits, which would have continued through the date of his retirement and of which his surviving spouse and next

of kin have been deprived, for which damages Pfizer is liable to the plaintiff.

22. The plaintiff Kimberley Kay Witczak and each of the decedent's next of kin, including such other next of kin not identified above (if any), have been deprived of the counsel, guidance, advice, comfort, assistance, companionship, and protection the decedent would have given them had he not died, for which damages Pfizer is liable to the plaintiff.

23. The plaintiff Kimberley Kay Witczak incurred funeral and burial expenses related to the decedent's death, for which Pfizer is liable to the plaintiff.

24. In addition, the plaintiff Kimberley Kay Witczak, as the decedent's surviving spouse, has been deprived of rights inherent in the marital relationship, including without limitation, the comfort, companionship, and services of her husband, for which damages Pfizer is liable to the plaintiff.

25. In addition, the plaintiff has sustained other damages not described above for which Pfizer is liable.

**COUNT TWO - STRICT LIABILITY**

As and for her second claim for relief against the defendant, the plaintiff re-alleges all foregoing allegations as if fully set forth hereunder, and further alleges as follows:

26. At all times herein mentioned, Zoloft was unsafe as manufactured, designed, marketed, and labeled, and Pfizer knew or should have known that Zoloft was unsafe.

27. At all times herein mentioned, Zoloft produced serious and sometimes fatal side effects, and Pfizer knew or should have known that Zoloft could be unsafe because of said side-effects.

28. At all times hereinafter mentioned, neither members of the medical community nor members of the general public knew of the dangers existing with respect to the administration of Zoloft and/or of the

side effects and/or inadequate testing prior to ingestion by Timothy Michael Witczak.

29. Zoloft was used by decedent in the manner in which Pfizer intended it to be used.

30. Timothy Michael Witczak used or otherwise consumed Zoloft in the amounts and manner and for the purpose recommended by Pfizer.

31. At all times material hereto, in the U.S., Pfizer failed to provide proper and adequate information for safe, informed use of Zoloft. In particular, Pfizer did not inform either prescribing doctors or the consuming public that the use of Zoloft can result in depersonalization, emotional blunting, akathisia and other chemically-induced conditions that can increase the risk of self-harm.

32. Pfizer promoted and maintained Zoloft on the market with the knowledge of Zoloft's unreasonable risk to the public in general, and specifically to Timothy Michael Witczak.

33. Zoloft as used by decedent was defective and unreasonably dangerous when sold by Pfizer, hence Pfizer is strictly liable for the injuries arising from its manufacture and Timothy Michael Witczak's use.

34. As a direct and proximate result of the above, the plaintiff suffered and will continue to suffer the injuries and damages described above, for which damages Pfizer is liable to the plaintiff.

**COUNT THREE - FRAUD**

As and for her third claim for relief against the defendant, the plaintiff re-alleges all foregoing allegations as if fully set forth hereunder, and further alleges as follows:

35. Pfizer has defrauded the medical profession (including decedent's family physician), the Zoloft patient population (including decedent), and the general public (including decedent's friends and family) in that it, among other acts:

(a) Fraudulently mischaracterized and miscoded suicidal ideation and/or attempts occurring during the clinical trials so as to reduce the number of occurrences;

(b) Deliberately changed its reporting requirements so that clinical trial investigators stopped reporting akathisia, a drug-induced condition that significantly increases the risk of self-harm, and instead replaced reports of akathisia with reports of agitation, anxiety, nervousness, and a number of other terms. In addition, Pfizer fraudulently withheld vital information with respect to the risk akathisia presented to users of Zoloft, including the potential for thoughts of self-harm and subsequent actions;

(c) Failed to inform the medical and research communities that a significant number of individuals taking Zoloft during clinical trials attempted or committed acts of self-harm, particularly when compared to placebo;

(d) Fraudulently claimed that Zoloft's characteristic side effects of insomnia, agitation and anxiety were of little or no concern when in fact these effects are known to be among the most critical and deadly of the short-term risk factors for self-harm;

(e) Fraudulently redefined acts of self-harm which occurred in the clinical trials (for patients in the Zoloft group) in order to conceal the high incidence of attempts by persons on the drug to hurt or kill themselves;

(f) Fraudulently denied that Zoloft can cause serious or deadly thoughts or acts of self-harm when its own investigators informed Pfizer that Zoloft was responsible for causing such conditions. Pfizer itself has attributed such events to Zoloft;

(g) Allowing the reduction of the dosage of Zoloft in clinical trials to lessen side effects in order to avoid the reporting of treatment-emergent adverse events including but not limited to akathisia;

(h) Allowing the use of concomitant medications in clinical trials to lessen side effects in order to avoid the reporting of treatment-emergent adverse events, such as akathisia;

(i) Falsely promoted that randomized controlled clinical trials are the only way to determine whether side effects relating to Zoloft, such as Zoloft-induced acts of self-harm, are causally related to Zoloft, thus trying to hide behind convoluted statistical analyses and deceiving the medical community and the public generally thereby;

(j) Aggressively promoted Zoloft to non-psychiatric medical doctors (the group that Pfizer has targeted for its promotional activities[3]) while acknowledging that a general practitioner's knowledge, training, and ability to diagnose and treat depression is inadequate;

(k) Over-promoted Zoloft in order to increase its sale by sponsoring award programs for doctors; and conducting and sponsoring campaigns to increase the diagnosis of depression by general practitioners; sponsoring lectures and seminars under the guise of education when its true purpose was to increase the sales of Zoloft; and

(l) Encouraged patients to continue their treatment with Zoloft, through such programs as "RHYTHMS," for the stated purpose of ensuring the patient's own medical welfare, while internally admitting that the problem of patients not continuing with treatment is an enormous "economic" problem

---

[3] Pfizer's promotion of Zoloft is intense in the extreme as to treating physicians. Sales people from at least four different divisions of Pfizer, i.e., Roerig, Pratt, Alta and CNS, each visit the same group of doctors within a given geographic area at different times and promote Zoloft over and over again. Their promotional tactics include bringing free lunches, giving away pens, cups, scratch pads, plates, napkins, slim jims, key chains, desk clocks, smile magnets, favorable journal article reprints, post-it stickers and promotional drug starter kits and even extend to recruiting and paying physicians to give lectures sponsored by Pfizer. Pfizer encourages doctors to prescribe Zoloft by misrepresenting the efficacy and "safety" of the drug and failing to fully inform them of side effects that must be closely monitored, such as those set forth herein.

to Pfizer, not a medical one for patients.

36. As a result of Pfizer's fraudulent acts and omissions as set forth herein, Pfizer has deceived the medical community, including decedent's physician, into believing Zoloft was safe as promoted when it was not.

37. When said representations were made by Pfizer, it knew those representations to be false, or willfully and wantonly and recklessly disregarded whether the representations were true. These representations were made by Pfizer with the intent of defrauding and deceiving the public in general and the medical community and with the intent of inducing the public to take Zoloft and the medical community to recommend, prescribe, and dispense Zoloft.

38. At the time the aforesaid representations were made by Pfizer, and at the time that Timothy Michael Witczak ingested Zoloft, both he and his prescribing physician were unaware of the falsity of said representations and reasonably relied on Pfizer's assertions, promulgated through its aggressive sales force to his physician as set forth herein, that the drug was safe and effective. In reliance upon said representations, Timothy Michael Witczak's physician did prescribe Zoloft and Timothy Michael Witczak was induced to and did take Zoloft. Had Timothy Michael Witczak known of the actual dangers of Zoloft, through his physician or otherwise, he would not have ingested Zoloft, or ceased taking it once its side effects (which were clearly known to Pfizer, but not fully disclosed to physicians or the public) became apparent.

39. Pfizer's motive in failing to advise physicians and the public of the adverse reactions that can increase the risk of suicide (and that it knew a percentage of users of the drug inevitably would experience) was for financial gain and its fear that if Pfizer provided proper and adequate information,

Zoloft would lose its share of the SSRI market.

40. At all times relevant herein, the conduct of Pfizer, as set forth hereinabove, was malicious, fraudulent, and oppressive toward the decedent and the public generally, and Pfizer conducted itself in a willful, wanton and reckless manner in the manner set forth hereinabove. Despite its specific knowledge as set forth above, Pfizer deliberately recommended, manufactured, produced, marketed, sold, distributed, merchandised, packaged, promoted and advertised the dangerous and defective drug Zoloft. All of the foregoing constitute an utter, wanton and conscious disregard of the rights and safety of a large segment of the public, and by reason thereof, Pfizer is guilty of reckless, willful and wanton acts and omissions which evidence a total and conscious disregard for the safety of the decedent and others, which proximately caused the damages set forth above, for which damages the defendant is liable to the plaintiff..

**COUNT FOUR - BREACH OF WARRANTY**

As and for her fourth claim for relief against the defendant, the plaintiff re-alleges all foregoing allegations as if fully set forth hereunder, and further alleges as follows:

41. At all times herein mentioned, Defendant Pfizer, utilized promotional materials and activities, and the advertising media to urge doctors, such as Timothy Michael Witczak's doctor, to prescribe Zoloft and patients, such as Timothy Michael Witczak, to purchase and use Zoloft. Pfizer expressly warranted to physicians, to decedent, and to other members of the general public, that said product was effective, safe and proper for its intended use.

42. Pfizer represented to the consumer who would use Zoloft and to the physicians who would prescribe it -- without full and complete disclosure of the risks of Zoloft's side effects -- that Zoloft was safe and efficacious, amounting to an express warranty of the safety and efficacy of Zoloft.

43. Pfizer, knew, or in the exercise of reasonable diligence should have known, that Zoloft had serious side effects such as those set forth herein that can lead to death.

44. Both decedent's physician as well as Timothy Michael Witczak relied on the express warranty representations of Pfizer, in the use of Zoloft, however, Zoloft was not effective, safe, and proper for its intended use as warranted in that Zoloft was not effective and made Timothy Michael Witczak worse, caused akathisia, emotional blunting, depersonalization and other chemically-induced conditions which led to his death.

45. As a direct and proximate result of the breach of warranty by Pfizer, the plaintiff suffered and will continue to suffer the damages described above, for which damages the defendant is liable to the plaintiff.

**WHEREFORE**, the plaintiff prays for entry of Judgment against Pfizer as follows:

A. Awarding the plaintiff, Kimberley Kay Witczak, as surviving spouse and Trustee for the Next of Kin, damages in excess of $50,000[4], the total to be distributed among the next of kin and the surviving spouse as provided by law;

B. Awarding the plaintiff, Kimberley Kay Witczak, the decedent's surviving spouse, damages for funeral and burial expenses, and for loss of consortium in an amount in excess of $50,000;[5]

C. Awarding the plaintiff for costs, disbursements, and prejudgment interest; and

---

[4] Minn. Stat. §544.36 and Minn.R.Civ.P. 8.01 prohibit a plaintiff who seeks more than $50,000 in unliquidated damages from assigning in the complaint a dollar amount to the damages he or she seeks, and requires such a plaintiff simply to state that a recovery of reasonable damages in an amount greater than $50,000 is sought.

[5] See preceding note.

D. Awarding the plaintiff such legal and other relief as the Court or Jury deems just and equitable:[6]

**PLAINTIFF DEMANDS A TRIAL BY JURY**

BAUM HEDLUND
Lead Counsel for Plaintiff

Dated: May 19, 2004 By: ______________________

George W. Murgatroyd III
Jessica R. Dart
12100 Wilshire Blvd., Suite 950
Los Angeles, CA 90025
(310) 207-3233

JAMES G. RYAN
Local Counsel for Plaintiff

James G. Ryan
Attorney Reg. No. 155962
820 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 338-3872

[6] Minn. Stat. §549.191 prohibits a plaintiff from seeking punitive damages in the complaint, and requires a motion to amend the complaint before such damages may be sought. The plaintiff hereby notifies the defendant that she reserves her right to seek punitive damages in this proceeding.

**ACKNOWLEDGMENT PURSUANT TO
MINN. STAT. §549.211**

The plaintiff, by her attorneys, acknowledges that costs, disbursements, and reasonable attorney and witness fees may be awarded to the opposing party if the plaintiff is found to have acted in bad faith in bringing this action, to have asserted a claim or defense knowing it to be frivolous or to have engaged in other conduct described in Minn. Stat. Sec. 549.211, subd. 2.

BAUM HEDLUND
Lead Counsel for Plaintiff

Dated: May 19, 2004 By: [signature]

George W. Murgatroyd III
Jessica R. Dart
12100 Wilshire Blvd., Suite 950
Los Angeles, CA 90025
(310) 207-3233

JAMES G. RYAN
Local Counsel for Plaintiff

James G. Ryan
Attorney Reg. No. 155962
820 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 338-3872

STATE OF MINNESOTA

COUNTY OF HENNEPIN

FILED PSL

04 MAY 12 PM 3:42

BY ______ DEPUTY
HENN CO. DISTRICT
COURT ADMINISTRATOR

DISTRICT COURT

FOURTH JUDICIAL DISTRICT

Case Type: Wrongful Death

In the matter of the Appointment of a Trustee for the Surviving Spouse and Next of Kin of Timothy Michael Witczak, Decedent.

(Appointment of Trustee in Wrongful Death Action)

Court File No. 04-6680

## ORDER APPOINTING TRUSTEE

In the matter of the appointment of a Trustee for the next of kin of Timothy Michael Witczak, the Court being fully advised in the premises on the basis of the Petition and Consent of Kimberley Kay Witczak, and certification thereof by said next of kin and the Motion of Counsel,

**IT IS HEREBY ORDERED:**

That upon the Petition and Consent, and upon the filing of an Oath pursuant to Minnesota Statutes §573.02, Kimberley Kay Witczak is hereby appointed Trustee to commence and maintain an action for wrongful death as set forth in the Petition, and that the Trustee need not post a bond in this matter.

Dated: 5-12-04

**BY THE COURT:**

The Honorable H. Peter Albrecht
Judge of District Court

**EXHIBIT A**

STATE OF MINNESOTA — DISTRICT COURT

COUNTY OF HENNEPIN — FOURTH JUDICIAL DISTRICT

FILED PSL
04 MAY 12 PM 3:42
BY ______ DEPUTY
HENN CO. DISTRICT COURT ADMINISTRATOR

Case Type: Wrongful Death

Court File No. 04-6686

In the matter of the Appointment of a Trustee for the Surviving Spouse and Next of Kin of Timothy Michael Witczak, Decedent.

**ORDER ADMITTING OUT-OF-STATE COUNSEL PRO HAC VICE FOR PURPOSES OF WRONGFUL-DEATH PROCEEDING**

Based upon the motion of James G. Ryan, an attorney licensed to practice before this Court, and pursuant to Rule 5 of the General Rules of Practice for the District Courts of the State of Minnesota,

**IT IS HEREBY ORDERED:**

That the motion of James G. Ryan for the admittance pro hac vice of George W. Murgatroyd III and Jessica R. Dart of the law firm of Baum Hedlund of Los Angeles, California be and hereby is granted.

Dated: 5-12-04

**BY THE COURT:**

The Honorable H. Peter Albrecht
Judge of District Court

**EXHIBIT B**

# NOTICE OF POSSIBLE CLAIM

**TO:** Pfizer Inc.
235 E. 42nd Street
New York, NY. 10017

Pfizer Inc.
c/o CT Corporation System, Inc.
405 Second Avenue South
Minneapolis, MN 55401

**CLAIMANT:** Kimberley Witczak
2414 W. 54th St.
Minneapolis, MN. 55424

PURSUANT TO SECTION 604.04 of the Minnesota Statutes, a copy of which is attached, you are hereby notified that **KIMBERLEY WITCZAK**, surviving spouse of Timothy Witczak, intends to claim damages against Pfizer, Inc. for or account of the wrongful death of her husband, Timothy Witczak, arising out of his ingestion of the drug Zoloft which was manufactured, distributed and sold by Pfizer, Inc. The drug was prescribed by Timothy Witczak's treating physician and used as intended by Pfizer, Inc. At all times, Pfizer, Inc. was aware that Zoloft can and does cause severe side effects including anxiety, agitation, insomnia, emotional blunting and akathisia (severe restlessness) that can result in acts of self-harm resulting in injury and/or death, yet failed to inform either prescribing physicians and/or the consuming public of the drug's dangers. As a result, on August 6, 2003, Timothy Witczak died of Zoloft-induced acts of self-harm, to wit hanging. He was found in the garage of their residence.

PURSUANT TO SAID STATUTE, you are hereby required to "promptly furnish to the [undersigned] the names and addresses of all persons [you] know to be in the chain of manufacture or distribution [of said product] . . . "

Claimant will seek all relief available under Minnesota law, including but not limited to damages in an amount that will fairly and adequately compensate her and the decedent's next of kin for the losses suffered based on the decedent's life expectancy and numerous other factors, including without limitation: (a) the counsel, guidance, advice, aid, comfort, assistance, and protection the decedent would have provided her and the next of kin, (b) the time with the decedent she and each of the next of kin have lost, (c) pecuniary damages based on the decedent's occupation, past contributions, and future earning capacity, (d) the expenses incurred for the funeral, burial, and related items, and (e) the expenses incurred due to the decedent's last medical condition, including necessary medical and hospital expenses incurred after and as a result of the injuries causing death. A dollar figure cannot at this time be assigned the above-described damages but will be specified during the course of any proceeding hereinafter commenced.

Dated: April 21, 2004

James G. Ryan
Attorney Reg. No. 155962
820 IDS Center
80 South Eighth Street
Minneapolis, MN 55402

016E

**EXHIBIT C**

**MINN. STAT. §604.04 – Notice of possible claim required**

**Subdivision 1.** The attorney for a person who intends to claim damage for or on account of personal injury, death or property damage arising out of the manufacture, sale, use or consumption of a product shall cause to be presented a notice of possible claim stating the time, place and circumstances of events giving rise to the claim and an estimate of compensation or other relief to be sought. This notice shall be given within six months of the date of entering into an attorney-client relation with the claimant in regard to the claim. Notice shall be given to all persons against whom the claim is likely to be made. Any person in the chain of manufacture and distribution shall promptly furnish to the claimant's attorney the names and addresses of all persons the person knows to be in the chain of manufacture and distribution if requested to do so by the attorney at the time the notice is given. Failure to furnish this information shall subject the person to the liability provided for in subdivision 3.

Actual notice of sufficient facts to reasonably put a person against whom the claim is to be made or the person's insurer on notice of a possible claim satisfies the notice requirements of this section. Failure to state an estimate of the amount of compensation or other relief demanded does not invalidate the notice, but the claimant shall furnish full information regarding the nature and extent of the injuries and damages within 15 days after demand by a person to whom the notice was given or by the person's insurer.

**Subd. 2.** A claimant who delays entering into an attorney-client relation with the purpose of delaying unreasonably the notice required by subdivision 1 is subject to liability as provided in subdivision 3.

**Subd. 3.** Any person injured by the failure of a claimant or the claimant's attorney or of a person in the chain of manufacture and distribution to comply with the requirements of this section may recover damages, costs and reasonable attorney fees from a person who violated this section, but failure to give notice does not affect the validity of a claim against a party who did not receive notice.

CREDIT(S)

Laws 1978, c. 738, § 10, eff. April 15, 1978. Amended by Laws 1986, c. 444.

Current with 2004 Regular Session laws through Chapter 135

Copr. © 2003 West, a Thomson business

END OF DOCUMENT

PX:L31
PRESCRIBING INFORMATION

# PAXIL®

**(paroxetine hydrochloride)**
**Tablets and Oral Suspension**

## DESCRIPTION

PAXIL (paroxetine hydrochloride) is an orally administered psychotropic drug. It is the hydrochloride salt of a phenylpiperidine compound identified chemically as (-)-*trans*-4*R*-(4'-fluorophenyl)-3*S*-[(3',4'-methylenedioxyphenoxy) methyl] piperidine hydrochloride hemihydrate and has the empirical formula of $C_{19}H_{20}FNO_3 \bullet HCl \bullet 1/2H_2O$. The molecular weight is 374.8 (329.4 as free base). The structural formula of paroxetine hydrochloride is:




Paroxetine hydrochloride is an odorless, off-white powder, having a melting point range of 120° to 138°C and a solubility of 5.4 mg/mL in water.

**Tablets:** Each film-coated tablet contains paroxetine hydrochloride equivalent to paroxetine as follows: 10 mg–yellow (scored); 20 mg–pink (scored); 30 mg–blue, 40 mg–green. Inactive ingredients consist of dibasic calcium phosphate dihydrate, hypromellose, magnesium stearate, polyethylene glycols, polysorbate 80, sodium starch glycolate, titanium dioxide, and 1 or more of the following: D&C Red No. 30, D&C Yellow No. 10, FD&C Blue No. 2, FD&C Yellow No. 6.

**Suspension for Oral Administration:** Each 5 mL of orange-colored, orange-flavored liquid contains paroxetine hydrochloride equivalent to paroxetine, 10 mg. Inactive ingredients consist of polacrilin potassium, microcrystalline cellulose, propylene glycol, glycerin, sorbitol, methyl paraben, propyl paraben, sodium citrate dihydrate, citric acid anhydrate, sodium saccharin, flavorings, FD&C Yellow No. 6, and simethicone emulsion, USP.

## CLINICAL PHARMACOLOGY

**Pharmacodynamics:** The efficacy of paroxetine in the treatment of major depressive disorder, social anxiety disorder, obsessive compulsive disorder (OCD), panic disorder (PD), generalized anxiety disorder (GAD), and posttraumatic stress disorder (PTSD) is presumed to be linked to potentiation of serotonergic activity in the central nervous system resulting from inhibition of neuronal reuptake of serotonin (5-hydroxy-tryptamine, 5-HT). Studies at clinically relevant doses in humans have demonstrated that paroxetine blocks the uptake of serotonin into human platelets. In vitro studies in animals also suggest that paroxetine is a potent and highly



016G

EXHIBIT D

or sense of foreshortened future; and symptoms of autonomic arousal including hypervigilance, exaggerated startle response, sleep disturbance, impaired concentration, and irritability or outbursts of anger. A PTSD diagnosis requires that the symptoms are present for at least a month and that they cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

The efficacy of PAXIL in longer-term treatment of PTSD, i.e., for more than 12 weeks, has not been systematically evaluated in placebo-controlled trials. Therefore, the physician who elects to prescribe PAXIL for extended periods should periodically re-evaluate the long-term usefulness of the drug for the individual patient (see DOSAGE AND ADMINISTRATION).

## CONTRAINDICATIONS

Concomitant use in patients taking either monoamine oxidase inhibitors (MAOIs) or thioridazine is contraindicated (see WARNINGS and PRECAUTIONS).

PAXIL is contraindicated in patients with a hypersensitivity to paroxetine or any of the inactive ingredients in PAXIL.

## WARNINGS

**Potential for Interaction With Monoamine Oxidase Inhibitors:** **In patients receiving another serotonin reuptake inhibitor drug in combination with a monoamine oxidase inhibitor (MAOI), there have been reports of serious, sometimes fatal, reactions including hyperthermia, rigidity, myoclonus, autonomic instability with possible rapid fluctuations of vital signs, and mental status changes that include extreme agitation progressing to delirium and coma. These reactions have also been reported in patients who have recently discontinued that drug and have been started on an MAOI. Some cases presented with features resembling neuroleptic malignant syndrome. While there are no human data showing such an interaction with PAXIL, limited animal data on the effects of combined use of paroxetine and MAOIs suggest that these drugs may act synergistically to elevate blood pressure and evoke behavioral excitation. Therefore, it is recommended that PAXIL not be used in combination with an MAOI, or within 14 days of discontinuing treatment with an MAOI. At least 2 weeks should be allowed after stopping PAXIL before starting an MAOI.**

**Potential Interaction With Thioridazine:** **Thioridazine administration alone produces prolongation of the QTc interval, which is associated with serious ventricular arrhythmias, such as torsade de pointes–type arrhythmias, and sudden death. This effect appears to be dose related.**

**An in vivo study suggests that drugs which inhibit $P_{450}IID_6$, such as paroxetine, will elevate plasma levels of thioridazine. Therefore, it is recommended that paroxetine not be used in combination with thioridazine (see CONTRAINDICATIONS and PRECAUTIONS).**

**Clinical Worsening and Suicide Risk:** Patients with major depressive disorder, both adult and pediatric, may experience worsening of their depression and/or the emergence of suicidal

ideation and behavior (suicidality), whether or not they are taking antidepressant medications, and this risk may persist until significant remission occurs. Although there has been a long-standing concern that antidepressants may have a role in inducing worsening of depression and the emergence of suicidality in certain patients, a causal role for antidepressants in inducing such behaviors has not been established. **Nevertheless, patients being treated with antidepressants should be observed closely for clinical worsening and suicidality, especially at the beginning of a course of drug therapy, or at the time of dose changes, either increases or decreases.** Consideration should be given to changing the therapeutic regimen, including possibly discontinuing the medication, in patients whose depression is persistently worse or whose emergent suicidality is severe, abrupt in onset, or was not part of the patient's presenting symptoms.

Because of the possibility of co-morbidity between major depressive disorder and other psychiatric and nonpsychiatric disorders, the same precautions observed when treating patients with major depressive disorder should be observed when treating patients with other psychiatric and nonpsychiatric disorders.

The following symptoms, anxiety, agitation, panic attacks, insomnia, irritability, hostility (aggressiveness), impulsivity, akathisia (psychomotor restlessness), hypomania, and mania, have been reported in adult and pediatric patients being treated with antidepressants for major depressive disorder as well as for other indications, both psychiatric and nonpsychiatric. Although a causal link between the emergence of such symptoms and either the worsening of depression and/or the emergence of suicidal impulses has not been established, consideration should be given to changing the therapeutic regimen, including possibly discontinuing the medication, in patients for whom such symptoms are severe, abrupt in onset, or were not part of the patient's presenting symptoms.

**Families and caregivers of patients being treated with antidepressants for major depressive disorder or other indications, both psychiatric and nonpsychiatric, should be alerted about the need to monitor patients for the emergence of agitation, irritability, and the other symptoms described above, as well as the emergence of suicidality, and to report such symptoms immediately to health care providers.** Prescriptions for PAXIL should be written for the smallest quantity of tablets consistent with good patient management, in order to reduce the risk of overdose.

If the decision has been made to discontinue treatment, medication should be tapered, as rapidly as is feasible, but with recognition that abrupt discontinuation can be associated with certain symptoms (see PRECAUTIONS and DOSAGE AND ADMINISTRATION—Discontinuation of Treatment With PAXIL, for a description of the risks of discontinuation of PAXIL).

It should be noted that PAXIL is not approved for use in treating any indications in the pediatric population.

A major depressive episode may be the initial presentation of bipolar disorder. It is generally believed (though not established in controlled trials) that treating such an episode with an

antidepressant alone may increase the likelihood of precipitation of a mixed/manic episode in patients at risk for bipolar disorder. Whether any of the symptoms described above represent such a conversion is unknown. However, prior to initiating treatment with an antidepressant, patients should be adequately screened to determine if they are at risk for bipolar disorder; such screening should include a detailed psychiatric history, including a family history of suicide, bipolar disorder, and depression. It should be noted that PAXIL is not approved for use in treating bipolar depression.

**PRECAUTIONS**

**General:** ***Activation of Mania/Hypomania:*** During premarketing testing, hypomania or mania occurred in approximately 1.0% of unipolar patients treated with PAXIL compared to 1.1% of active-control and 0.3% of placebo-treated unipolar patients. In a subset of patients classified as bipolar, the rate of manic episodes was 2.2% for PAXIL and 11.6% for the combined active-control groups. As with all drugs effective in the treatment of major depressive disorder, PAXIL should be used cautiously in patients with a history of mania.

***Seizures:*** During premarketing testing, seizures occurred in 0.1% of patients treated with PAXIL, a rate similar to that associated with other drugs effective in the treatment of major depressive disorder. PAXIL should be used cautiously in patients with a history of seizures. It should be discontinued in any patient who develops seizures.

***Discontinuation of Treatment With PAXIL:*** Recent clinical trials supporting the various approved indications for PAXIL employed a taper-phase regimen, rather than an abrupt discontinuation of treatment. The taper-phase regimen used in GAD and PTSD clinical trials involved an incremental decrease in the daily dose by 10 mg/day at weekly intervals. When a daily dose of 20 mg/day was reached, patients were continued on this dose for 1 week before treatment was stopped.

With this regimen in those studies, the following adverse events were reported at an incidence of 2% or greater for PAXIL and were at least twice that reported for placebo: Abnormal dreams, paresthesia, and dizziness. In the majority of patients, these events were mild to moderate and were self-limiting and did not require medical intervention.

During marketing of PAXIL and other SSRIs and SNRIs (serotonin and norepinephrine reuptake inhibitors), there have been spontaneous reports of adverse events occurring upon the discontinuation of these drugs (particularly when abrupt), including the following: Dysphoric mood, irritability, agitation, dizziness, sensory disturbances (e.g., paresthesias such as electric shock sensations), anxiety, confusion, headache, lethargy, emotional lability, insomnia, and hypomania. While these events are generally self-limiting, there have been reports of serious discontinuation symptoms.

Patients should be monitored for these symptoms when discontinuing treatment with PAXIL. A gradual reduction in the dose rather than abrupt cessation is recommended whenever possible. If intolerable symptoms occur following a decrease in the dose or upon discontinuation of treatment, then resuming the previously prescribed dose may be considered. Subsequently, the